### UNITED STATES v. CEMENT MFRS.' PROTECTIVE ASS'N et al.

(District Court, S. D. New York. October 23, 1923.)

No. 22/25.

Monopolies ⬥⟹12(3)—Association to distribute information as to prices, supply available, trade practices, etc., among competitors, held violation of Anti-Trust Act; "combination to restrict competition and restrain commerce."

The Cement Manufacturers' Protective Association, through the medium of which members exchanged detailed statistical information as to sales, prices charged, supply of cement available for sale and in process of manufacture, freight charges, trade practices, etc., held a "combination to restrict competition and restrain commerce," in violation of the Sherman Anti-Trust Act (Comp. St. §§ 8820–8823, 8827–8830), though there

⬥⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

was no formal agreement to follow the practices of other members, in view of the fact that, since the association was formed, its members by common consent and a concert of action have so conducted themselves as to lessen their competitive efforts, and have brought about, upon a higher price level, a uniformity and stability of quotations that previously did not exist.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Combination in Restraint of Trade.]

In Equity. Suit by the United States against the Cement Manufacturers' Protective Association and others. Decree for complainant.

William Hayward, U. S. Atty., of New York City (James A. Fowler and Roger Shale, Sp. Asst. Attys. Gen., of counsel), for the United States.

Archibald Cox, of New York City (John W. Davis, of New York City, George T. Buckingham, of Chicago, Ill., and Louis H. Porter, Thurlow M. Gordon, and Leland B. Garretson, all of New York City, of counsel), for defendants.

KNOX, District Judge. The Cement Manufacturers' Protective Association, the dissolution of which is here sought by the government, came into existence in January, 1916. The outline of the contemplated activities of the association was laid before the representatives of a number of the corporate defendants at a meeting in New York and was accompanied by this statement of the chairman:

"The idea of this thing is co-operation. * * * We all agree that the necessity of co-operation is acknowledged by everybody in the industry. The only question now we have to determine is how we can best make use of co-operation. * * *"

The adoption of a constitution and by-laws followed. I quote article III of the former:

"The objects of the association are the collection and dissemination of such accurate information as may serve to protect each manufacturer against misrepresentation, deception, and imposition, and enable him to conduct his business exactly as he pleases in every respect and particular, free from misdirection by false or insufficient information concerning the matters following, to wit: (a) Information concerning credits. (b) Information concerning contracts which have been made for the delivery of cement, sufficiently complete to enable the manufacturer to protect himself against spurious contracts and like transactions induced by misrepresentation. (c) Information concerning freight rates on cement. (d) Statistical information as to production, stocks of cement and clinker on hand, and shipments."

Article VIII of the same instrument further declared that:

"No member of the association shall enter into any arrangement, agreement, or understanding of any nature or kind whatsoever, the object of which is to restrain trade, limit competition, or accomplish any purpose contrary to the spirit or letter of the law, or contrary to the objects of the association, as set forth in this constitution, and membership in the association shall be recognized as implying that the member is absolutely free to conduct his business exactly as he pleases in every respect and particular."

"Full and complete minutes of all matters discussed at any meeting of the association shall be kept and such minutes, together with all records, files, and correspondence of the association, shall be preserved and held open to

any public official or other person who may have any legitimate reason for desiring to be completely informed concerning any or all the activities or transactions of the association."

The organization elected a president, vice president, secretary and treasurer, and monthly meetings of the members were provided for. The association had power "to employ such persons, incur such indebtedness, and fix such assessments as may appear necessary to carry out" its objects. All assessments were to be distributed among and paid by the members pro rata according to shipments during the preceding year from or into the territory covered by the service of the association. Section 8 of the by-laws imposed the following obligations upon the membership:

"On or before the 5th day of each calendar month, each member shall forward to the secretary the following:

"(1) A statement of all accounts outstanding sixty (60) days or more and unpaid, giving the name and address of the debtor, total amount unpaid, and the time overdue specified by months. A statement of all bills receivable on hand, giving name of purchaser, amount, date payable, and detail of account covered by note. A list of accounts in attorneys' hands for collection.

"(2) A statement of contracts which have been made and are in effect on the last day of the preceding calendar month, giving the following information with respect to each contract, namely, date of contract, the purchaser, the consumer, a full description of the work upon which the cement is to be used, the amount contracted for, and amount yet to be delivered, the price, and the expiration date of contract. In addition to the foregoing monthly statements of contracts, as contracts are made during the month, the secretary shall be notified as soon as possible.

"(3) A statement of all contracts canceled or reduced in amount during the preceding month.

"(4) A statistical statement of production and shipments during the preceding calendar month and stock of cement and clinker on hand on the last day of the month.

"Upon the receipt of the foregoing monthly statements, the secretary shall forthwith put all the information contained therein in convenient form as directed by the association and distribute the information thus prepared to the members reporting. The secretary shall also transmit the information thus prepared to the person performing corresponding duties in any other association, collecting and distributing like information within the purview of the constitution, and receive and distribute to the members of this association such information transmitted from such other association as may be from time to time directed by this association.

"The Secretary shall prepare and distribute among the members a complete schedule or schedules of freight rates, on cement, giving the rates for rail, water and rail, and water shipments. Each member shall from time to time notify the Secretary of all changes of other facts of importance connected with such rates. The Secretary shall immediately advise all members of changes in freight rates by issuing supplements, revisions, or otherwise, as may be most convenient."

With the preliminaries of organization out of the way, the proposed plan of procedure was put into operation. An elaborate system of about 40 forms, upon which various reports were to be made and distributed, was devised, and members were supplied with such as covered reports to be made by individual companies. Thereafter they were regularly used. As and when the secretary of the association received reports from individual companies, he made appropriate tabulations, and forwarded them to the interested parties.

Before undertaking a discussion of the various reports, it may be well to state that, when the association was formed, most of its members were already pursuing certain trade practices, more or less uniform, among which were the following: (1) Selling cement f. o. b. point of delivery. (2) Allowing a differential between prices quoted dealers in cement and those quoted contractors and other consumers of cement. (3) Charging purchasers of the cement for bags in which the product is shipped. (4) Allowing credit for bags returned to manufacturers in good condition. (5) Using basing points in quoting prices. (6) Including in all quotations for the sale of cement of the freight rates from a basing point to the place of delivery, and this, even though rates of transportation by private conveyance from mill to delivery point might be less than the published rail traffic. (7) Granting trade discounts. (8) Limiting the time within which quotations might be accepted and deliveries made. (9) Making charges for bin test. (10) Making specific job contracts for future delivery.

Now it may be conceded, as contended by defendant, that some of the foregoing practices mean nothing more than that the elements entering into a quoted market price have been separately listed. This being so, I think that all of defendants realized that, in so far as such practices were uniform and so continued, there would be less chance of any of the elements being so used as to effect quotations for cement as expressed in dollars and cents. Each company had a vivid recollection of a ruinous price war that had been waged a year or so before, and none of them wished for it to break out afresh. The time was ripe for an association wherein the danger of competition as to any of the foregoing particulars would be reduced to a minimum.

With this digression, I return to the exchange of the information contemplated and provided under the association's plan. The furnishing of information by the individual companies with respect to item 2 of section 8 of the by-laws, above quoted, related solely to what are known as specific job contracts. These are agreements whereby a manufacturer is to deliver in the future the cement to be used in a specific work, such as a particular building or road, and the obligation is that the manufacturer shall furnish, and the contractor shall take, only such cement as is required for or used for the specified purpose. In the year 1921, such contracts covered about 30 per cent. of the annual cement production of all of the defendant corporations. That more and more of the commodity is annually being sold under these contracts is apparent, inasmuch as in 1919 but 16 per cent. of the production was applicable to them, while in 1920, the percentage had increased to 25 per cent.

When such a contract was closed, the manufacturer, either immediately or a few days thereafter, advised the association of the contract number, its date, the name and address of the purchaser, an identification of the work, the contractor's name, the number of barrels, the price, the delivery point, and the date upon which the contract would expire. Upon receipt of this information by the secretary, it was at once sent to each of the members. As and when the contracts were completed, reduced in amount, extended, or canceled, a like notification

went to all members. If further information was desired, it could be had upon request. The association's daily reports were accompanied by a summary of previous reports, in which was set forth the number of new specific job contracts received for that day and to date, the prices at which the contracts were written, the number of barrels contracted for as of that day and to date, the number of barrels canceled as of that day and to date, together with all reinstatements, increases, or decreases in barrels of that day and to date.

In addition to the foregoing, a quarterly report was issued, wherein every specific job contract being carried by all the companies was set forth. A monthly summary, regularly issued, indicated the companies' commitments for cement in the several states. Other information, furnished and distributed as above, related to the quantity of cement on hand, the quantity of clinker produced (clinker represents that stage in the manufacture of cement which immediately precedes the production of the commodity in merchantable form), cement ground, all cement shipped, whether for dealers or upon account of specific job contracts, and clinker in stock. Reports embodying these details also showed the percentage of decrease or increase in the various items, as compared with similar months and periods in the preceding year. They further disclosed the number of barrels of cement shipped by one company for the account of another.

Reports were made of the delinquent accounts of customers, showing their names and addresses, the ledger balance, and whether the accounts were two, three, four, or more months old. If the account had been given to an attorney for collection, the fact was noted. Summary reports went to the members at monthly periods. The greater portion of the cement sold within the eastern states is shipped in cloth bags, each bag containing one-quarter of a barrel of cement. The bags are usually charged to the purchaser, at 10 cents. For each one returned to the manufacturer in good condition, the purchaser is allowed a rebate of 10 cents. The experience of each company in respect to bags returned was of interest to all others, and this incident of the business was the subject-matter of more or less elaborate statistics.

Beyond what has been stated, the association engaged in the activity of compiling freight rates for the carriage of cement from certain "mill bases" used by the defendants to the various cities and towns within the northeastern portion of the United States. As previously said, each manufacturer of cement sells its product f. o. b. point of delivery, and ordinarily will not quote a price f. o. b. its mill. The record indicates a marked uniformity in the price at which cement was offered by the various defendants at any given time. This uniformity, the government charges, is brought about in part, at least, by the use of books distributed to the association membership, and containing the freight rates per barrel of cement from mill-basing points to destination. The charge is vigorously denied by defendants, and thus there is presented one of the outstanding features of the case.

The freight rates books standing alone, and in so far as they merely record a compilation of lawful freight rates, are harmless. Their vice, if such it be, resides in the fact that there is a concert of action upon the part of defendants in so using them that all prices quoted are

for delivery at the point required by the purchaser, and that no cement will be sold in such manner as will permit a purchaser to take advantage of cheaper transportation charges than are required to be paid for the shipment of cement by rail. In extenuation of the practice, it is said that this method of marketing cement is a trade custom, which came into being before the formation of the association; that it results from the independent and uncontrolled action of each manufacturer, and is in no way to be attributed to agreement, or any activity, of the association. Very probably there is no agreement now in force by which such practice is to be followed. The custom, however, was at one time the subject of an agreement to which 13 of the corporate defendants were parties, viz. the "Articles of Association of Licensed Cement Manufacturers," dated June 30, 1909.

That agreement, whatever may have been the justification for its existence, obligated each licensed dealer named therein to observe certain practices, which, if they were now the subject of contract, would without doubt entitle the government to the relief sought. It is not without interest to note the similarity existing between the uniformities and facilities now availed of by defendant corporations and the practices observed by a number of them under the license agreement, and which seem to have then been regarded as helpful, if not essential, in an endeavor to maintain prices and to apportion territory. The similarities are: (1) Periodical reports relating to production and shipment. (2) Price quotations for delivery of cement at destination. (3) Uniform discounts to dealers. (4) Uniform discounts to consumers. (5) Uniform terms of payment. (6) Uniform charges and allowances for bags, with the requirement of reports in reference thereto. (7) Use of basing points for the calculation of freight rates. (8) A uniform period within which quotations should be in force and delivery made. (9) The use of a book to be used in quoting prices, and which included freight rates from shipping points to places of destination in the northeastern states, and which were computed and published by the association.

Under the present association there is no method provided for disciplining and penalizing members for a departure from the foregoing practices, as was the fact under the licensing agreement. Neither is there now any compact that cement shall not be sold below a specified price. It is true, however, that departures from present uniformities and delays in making reports are not favored. This is borne out by statements made at meetings of the present association, when some of the practices gave rise to discussion. For instance, the chairman of the meeting held May 15, 1916, asked that contract information be reported at the earliest minute, calling attention to the fact that the members were sufferers from any delay. One person suggested the imposition of a fine upon companies which did not send in their reports by the 5th day of each month. This proposal, however, was never put into effect.

The question as to whether the manufacturer of cement should allow a discount of 5 cents per barrel to customers who did not pay their bill within 30 days gave the persons attending association meet-

ings considerable concern. After much discussion, the president said that it was the consensus of opinion that quotation forms should be changed, so that no discount would be made to a delinquent debtor, saying, also, that the decision was not for the association, but for the individual companies. At the October meeting in 1916, it was resolved:

"To make * * * statistics more complete, and that each member report to the secretary the annual productive capacity of his operation, and that the secretary tabulate and send to each member a copy of the tabulation."

The resolution was complied with. It is argued by defendants that statistics having to do with the production capacity of the several mills were in round figures, and had no relation to actual production or shipment, and that no attention was paid to them. Granting this to be true, each member of the association was supplied from time to time with statistics of actual production and shipments, was enabled to guage the probable output of each mill from a practical, rather than a theoretical, standpoint. The desire for uniformity in trade practice is emphasized by the attitude assumed towards reports having to do with allowances for returned bags. At a meeting of the association upon April 17, 1916, a representative of the Giant Company had this to say:

"If a man returns 1,000 bags and is dealing with three companies, it would be more or less of a rebate if one company were giving him full credit for worthless bags, and another one deducting a percentage of bags that were worthless."

The vice president of the Vulcanite Company commented as follows:

"Some companies were giving full credit. That was the information that has been reported, and that in effect practically meant a rebate—that is, giving a customer credit for bags which could not be used again, and it might be interesting from the credit standpoint to know just what the general practice was in that respect."

At a meeting held in June, 1916, the same vice president of the Vulcanite Company remarked:

"We want our practice to be the same as the others."

Similar colloquies took place at other meetings as to the possibility of discounts and extensions of credit being used for the purpose of rebating. In my judgment, it was something more than a desire for statistics, as such, that was responsible for the association undertaking to find out from the several companies whether returned bags were first cleaned and then counted, or were first counted and then cleaned. It was important that the practice be as nearly uniform as possible, so that the bag report would reflect the shading of prices that might be engaged in by a manufacturer. A disclosure of what was being done in making allowances for bags, while it could be used for competition, was, I think, more likely intended to impose a restraint upon any company that was shading prices.

Reverting to the exchange of statistics, in which the selling price of specific job contract cement is sold, it seems apparent that such quotation will also reveal the market prices for cement sold to dealers. The evidence is that upon a given day the price of cement to dealers

is 10 cents less per barrel than that sold upon the same day to a consumer for use in a specific job. Each manufacturer is thus apprised of the amount being charged for cement for all purposes by its competitors. From reports of stock on hand, each member received, in effect, a forecast of his competitors' view of the immediate market, and, that there might be no misconception as to actual business being transacted by any one mill, the reports were careful to specify the amount of cement which one mill sometimes shipped for another.

The care manifested in this regard brings me to a consideration of the practice under which manufacturers protected themselves against the diversion and "misuse" of cement under specific job contracts. Only under such contracts is there any obligation upon a manufacturer to deliver cement at a specific price over any extended period of the future. There was accordingly great effort to see that no specific job cement was diverted and used otherwise. If so, it might enter into competition with cement thereafter sold by the company at then current prices. Then, too, if more than one person, say a contractor putting in a bid for work, had covered himself for the quantity of cement necessary for a certain specific job, and thereafter did not obtain the contract for the work, the manufacturers were desirous that such contract be canceled, lest it confuse their estimate of outstanding commitments, and also that the cement thus contracted for, if delivery should be asked, should not affect a later market. For this reason, specific job contracts provided for "the full Portland cement requirements of the following described work" and stipulated that the cement should not be used for any other purpose.

Contracts of this character were substantially uniform among all the companies. In order to protect the manufacturers against any alleged misuse or diversion of cement, the association employed a force of checkers or auditors. These men were familiar with building construction, and it was their duty to investigate specific job contracts, to ascertain what contractor had secured a particular work, the amount of cement that probably would be used in the work, and whether any cement obtained for such work was being used for other purposes. Upon obtaining the report of the checker, the association would communicate the same to the manufacturers, and such of them as had specific job contracts with persons who were not actually to furnish cement to the job would cancel. Also, if the estimate of the amount of cement to be used seemed excessive, a reduction in the requirements of the contract would generally take place. The action of the companies canceling or reducing commitments would at once be made known to each of the others. Upon one occasion, cancellation amounted to no more than one-fourth of a barrel of cement.

Of course, if a company wished to recognize an agreement made with a contractor or person who had expected to supply cement to a specific job, and who did not get the work, but was willing to take the cement, notwithstanding, it might do so. But my distinct impression is that one of the prime reasons for exercising such strict supervision over specific job work, and in reporting the cancellation of infinitesimal quantities of cement, was to exert a moral compulsion upon a com-

pany, which was inclined to recognize a contract such as I have just referred to, and to make assurance doubly sure that over any future time there would be no "free" cement.

The record, as I have said, contains much matter to indicate that at any given time the prices at which the various companies sold cement were uniform, and that, when one company did change its quotation, the other companies delayed but little in falling into line. Considerable argument has been made to the effect that uniformity of price is evidence of perfect competition, and that the record abundantly proves the defendant corporations to be real and vigorous competitors. I shall not undertake a discussion of the dollar and cents quotations of cement, save to say that since the association began to operate, there has been a uniformity and stability in such quotations that previously did not exist. As was testified, the determining factor upon which a cement contract would be given to one company over another was frequently nothing but the personality of its salesman.

Competition, as commonly understood, includes the more material elements of prices and terms, especially, I should think, in the sale of a standarized commodity such as cement, where considerations as to the superiority of one brand over another have all but been eliminated. Prices, of course, will exhibit some tendency towards uniformity, in that even a necessitous seller will not make a more favorable price than competitive conditions force him to take; and it may be, as economists say, that prices for a standardized product will actually become uniform, and will remain so over substantial periods of time, where competitive conditions are perfect. The fact is, however, that so long as there is a marked difference in production costs, in the financial necessities of manufacturers, in the location of mills as respects active markets, and there is less than a capacity production by all manufacturers who desire to sell cement, it is reasonably to be expected that there will be a difference in the inducements to be offered to prospective purchasers. In the particulars just mentioned, the defendant corporations (sic) are not similarly situated, and, if such similarity be a prerequisite of perfect competition, there can be none in this industry. If, under truly competitive conditions, the prices should upon occasion become uniform, I seriously doubt if they would long remain so. Producers would not be content with a situation wherein the field of competition was limited to the personality of the salesman representing his own company and that of his rivals.

The thought that the exchange of statistical information between the defendant companies was not for really competitive purposes receives some support from what was said at some of the association meetings. It seems that upon a few occasions salesmen of one or more companies obtained possession of some of the records and used the same in taking business from persons who had previously patronized other manufacturers. When word of this came to the association, the chairman expressed himself in the following language:

"When that information in detail is furnished to contractors and dealers, which has been done unquestionably, it not only detracts from the value of the information for the purposes the information is intended to cover, but it also makes very common the work which we are doing and your committee

wants to very strongly recommend that that information be used in a confidential way for the purpose of enlightening you as to the facts regarding contracts that are taken; that the information should not be given out promiscuously in any way that would unquestionably jeopardize the continuance of the furnishing of such information."

It was added:

"You can evidently see that the information given dealers would not be used in the same way that we handle it ourselves." "They use it right away as a basis to secure business. They use it in an entirely different way than we use it. They are not interested as to what contracts are filed in their town, unless they can secure some tonnage from the information they get from us."

He proceeded:

"There is another leak which I think usually exists so far as this information is concerned, and that is, it is very possible that a few of us are not careful enough as to where we keep our reports. Now, I found a tendency of salesmen coming in and the first thing they wanted to do was to go over the contract reports and look them over, and then they would go out and spread that information around everywhere, and that is going to hurt. * * *"

Still later in the discussion this was said:

"Yes; we had no thought or intention of suggesting any specific method, other than we have thought the information should be used as information for the executives of the companies, in order for them to check the operation of their salesmen, and not furnish the information to their salesmen, which, as a rule, would be used in a manner which would not be in accordance with the desire of the executives. The whole purpose of the information is that those in charge of the sales can be more intelligently informed by reason of having the truth; but that does not mean that everybody down the line to the office boy has to have that information, because they do not all know how to properly handle it."

As bearing upon the desires of the executives, I again refer to the Cement Dealers' License Agreement of 1909. If it be that the parties to that contract, and aside from any question of their good faith, thought it desirable, for the purpose of maintaining prices and apportioning territory, that the information called for by the agreement should be exchanged, it is quite within the range of probability that the formation of the present body, under which practices and customs are disclosed, and, through the disclosure, inevitably tend to become and remain uniform, was intended to attain a similar object.

Counsel for defendants have argued that "ignorance is not a virtue, and knowledge and information are not a crime." The accuracy of the statement, as a general proposition, is not questioned, but ordinarily the sources of wisdom and of knowledge are open to all interested persons upon more or less equal terms. Here such was not the fact. The situation in this respect, which here existed, was in the main the counterpart of that condemned in the United States v. American Linseed Oil Co., 43 Sup. Ct. 607, 67 L. Ed. 1035, where it was said:

"With intimate knowledge of the affairs of other producers, and * * * proclaiming themselves competitors, the subscribers went forth to deal with widely separated and unorganized customers, necessarily ignorant of the true conditions."

The defendants knew that, although there was no formal agreement to follow the practice of other manufacturers, such would be the

result; for, to employ the words used in proclaiming the advantages of the open competition plan discussed in American Column Co. v. United States, 257 U. S. 393, 42 Sup. Ct. 115 (66 L. Ed. 284, 21 A. L. R. 1093):

"Members do naturally follow their most intelligent competitors, if they know what these competitors have actually been doing."

There is, I take it, no need to find that the prices at which defendants sold cement during the period over which the association has functioned were excessive. Indeed, as compared with the rise in the prices of other basic commodities, it is possible to say that the quotations of cement advanced less than others. Nor can it be said that the association overcame and destroyed all competition between the defendant manufacturers; upon many occasions, they were active in an endeavor to take business from companies associated with them. In some instances, they undoubtedly offered inducements to purchasers, and thus secured orders that otherwise would not have been obtained.

But, upon the whole, and without further discussion of the great mass of evidence which goes to make up this record, I think that real competitive effort tended to become more and more feeble, that manufacturers, by reason of the exchange of statistics, were equipped to regulate their production, and by common consent and a concert of action did so, to the end that the cement supply would at all times be a lap or two behind the demand, and thus created higher prices. In enabling this to be done, the association, its officers and agents, together with its membership, materially limited the full and free operation of the contending forces of competition, to which the public, under the Sherman Law (Comp. St. §§ 8820–8823, 8827–8830), is entitled, and unreasonably affected interstate trade and commerce.

The government may have the decree for which it asks.