## UNITED STATES *v.* AMERICAN LINSEED OIL COMPANY ET AL.

APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF ILLINOIS.

No. 307. Argued April 25, 26, 1923.—Decided June 4, 1923.

For the avowed purpose of substituting so-called "open competition" for the normal competition theretofore prevailing between them, but really to defeat the Sherman Anti-Trust Act without subjecting themselves to its penalties, large manufacturers of linseed oil, oil cake and linseed meal, subscribed to an agreement with a central agency which required each of the subscribers: to reveal to the agency, promptly and periodically, intimate details of its business for transmission to the others; to subject itself to autocratic powers vested in the agency; to pay large fees to the agency and make it pecuniary deposits forfeitable for infractions of the agreement; to furnish schedules of prices and terms of sale and adhere to them (unless more onerous ones were obtained), until prepared to give immediate notice of departure therefrom for relay by the agency to the other subscribers; to be represented at monthly meetings and report upon matters of interest to be there discussed; and to comply with all reasonable requirements of the agency, and divulge no secrets. *Held,* that the necessary effect of the combination, viewed in the light of what was done under it, was to suppress competition, in violation of the Sherman Act. P. 388. *American Column & Lumber Co.* v. *United States,* 257 U. S. 377.

275 Fed. 939, reversed.

APPEAL from a decree of the District Court dismissing a bill for an injunction, brought under the Sherman Act.

*Mr. James A. Fowler,* Special Assistant to the Attorney General, with whom *Mr. Solicitor General Beck* was on the brief, for the United States.

The competition which it was intended by the Sherman Act to preserve was that existing in the economic world at the time of its enactment; and which had always existed and continued to exist, except as now and then inter-

fered with by unlawful agreements down to the organiza-tion of latter day associations and bureaus. Economists then supposed that prices were regulated by the law of supply and demand. Of course the price of an article was necessarily based on the cost of producing and selling it. It could not for any substantial length of time be sold at a price under cost of production and marketing; but the producer's profit depended upon the amount he could realize in excess of costs, and that was controlled by the demand and the supply in the market. The producer then sought to manufacture his article at the lowest cost pos-sible. He would figure a reasonable profit upon that cost, and would be satisfied if he could receive the amount thus determined. If he had an advantage in location; or for any reason he could obtain his raw material more cheaply than a competitor; or had his factory so organized that he could produce the article more economically, the public received the benefit of those advantages, unless the de-mand was substantially in excess of the supply; in which event naturally he increased his price, thus temporarily realizing a larger profit. If this condition continued for a time others entered the field, and the production soon equaled or probably exceeded the demand; and then it became a question of the survival of the fittest. Under those conditions but little attention was given to the prices of competitors. When the market was active be-cause the demand was great, prices naturally advanced; when business was depressed and demand lax, prices were reduced. Then producers were endeavoring to conceal every detail of their business from their competitors; and they were in ignorance of the details of each other's busi-ness except as they were accidentally revealed to them through agents, or possibly were obtained through some devious method. All effort, therefore, was concentrated upon producing the goods as cheaply as possible, so that they could sell them upon the market against competition,

and yet realize a reasonable profit; and no dependence was had upon the prices of competitors.

Under the present system of so-called " constructive " competition a precisely contrary course is pursued. Each producer of an article reveals every detail of his entire business to every competitor. He reports to him every sale, and the price at which it is made, and the locality to which it is shipped. They all agree upon terms of sale, and the amount that shall be charged to every locality in lieu of the freight from the mill to such locality. They adopt uniform practices with reference to storage, and conditions under which allowances shall be made. They then meet together and personally discuss every question relating to the production and distribution of the goods made by them. In other words, every producer is as familiar with the details of the business of his competitors as he is with those of his own business, or as they are with their business. Can anyone possessing intelligence sincerely contend that this revolution does not profoundly affect the economic laws governing prices which previously existed, and does not necessarily affect prices themselves? The result is that the producer now devotes his time to studying the business of his competitor instead of his own business. He interests himself in ascertaining whether his competitor has deviated at some point from an agreed uniform practice and in calling him upon the carpet to stop such deviation, rather than in figuring upon some means of reducing the cost of production. In determining upon prices he studies the price lists of his several competitors, ascertains what they are receiving for their goods in certain markets, and fixes his price therefrom instead of studying his cost sheet and determining what is a reasonable profit upon his investment.

If it be conceded that there are plausible arguments in support of this so-called " stabilization," which is nothing less than fixing prices, and of the effects of this so-called

" constructive " competition, the debate over that question is purely an economic and not a legal one. The undoubted fact is that economic laws are profoundly affected by this new system; and the Sherman Act was passed to maintain the system governing competition then existing; and any fundamental change in practice by agreement between competitors whereby prices of articles moving in interstate commerce are substantially affected is a violation of that act.

The combination between the defendants is unlawful, because when carried into effect it inevitably restrains interstate commerce. *American Column & Lumber Co.* v. *United States,* 257 U. S. 377.

It has been repeatedly held that any combination which necessarily results in a restraint of interstate commerce is violative of the Anti-Trust Act regardless of how innocent the intention of the parties thereto may have been. *United States* v. *Freight Association,* 166 U. S. 290; *Addyston Pipe Co.* v. *United States,* 175 U. S. 211; *United States* v. *St. Louis Terminal Co.,* 224 U. S. 383; *United States* v. *Reading Co.,* 226 U. S. 324; *United States* v. *Patten,* 226 U. S. 525; *Standard Sanitary Mfg. Co.* v. *United States,* 226 U. S. 20.

It is just as unlawful to agree upon practices as upon prices, as conveniences and favors to the trade suffer because of the elimination thereby of all competition in practices. *United States* v. *Union Pacific R. R. Co.,* 226 U. S. 61, 88.

The restraint resulting from the combination was an unreasonable and unlawful restraint. It has been assumed by some of the lower courts that in speaking of a reasonable restraint in the *Standard Oil Case,* 221 U. S. 1, Mr. Chief Justice White had reference to the amount of the restraint of interstate commerce. However, a careful consideration of that opinion shows that the learned Chief Justice had in mind the character of the agreement

or combination which produced the restraint, and not the extent of the restraint resulting therefrom.  221 U. S. 58. *United States* v. *American Tobacco Co.,* 221 U. S. 179; *United States* v. *Addyston Pipe Co.,* 85 Fed. 271.

The relief that should be granted in this case is an adjudication that the combination described in the bill and proven in the evidence is unlawful *in toto,* and an injunction inhibiting any further operation under the plan as a whole or under any part thereof. *American Column & Lumber Co.* v. *United States,* 257 U. S. 377; *Swift & Co.* v. *United States,* 196 U. S. 375.

*Mr. John Walsh,* with whom *Mr. Louis A. Spiess* was on the brief, for Ankeney Linseed Manufacturing Co. et al., appellees.

The charge of the Government in this case, is that the inevitable result of the exchange of true and accurate market information as to past transactions must inevitably result in a curtailment of production and the advancement of prices, and therefore is in violation of the Sherman Anti-Trust Act.

That act being a penal statute, proof of its violation must be clear, positive and convincing. *Northern Securities Co.* v. *United States,* 193 U. S. 197; *United States* v. *Reading Co.,* 183 Fed. 427.

We contend therefore that it is incumbent upon the Government to show that the operations of the Bureau necessarily had the effect of curtailing production or enhancing prices.  Further, if the Government relies on circumstantial evidence to prove a combination or conspiracy to restrain trade, as it asserts it does, it must show that the circumstances upon which reliance is placed are inconsistent with supposition of innocence.

The burden is on the Government in this case to prove by a clear and satisfying preponderance of evidence that

a combination or conspiracy existed among the defendants to bring about an unlawful result. The rule as to presumptions and burden of proof in a suit in equity for injunction to prohibit violations of the Sherman Act is substantially the same as in a criminal case for violation of the act. That rule is very clearly announced in *Union Pacific Coal Co.* v. *United States,* 173 Fed. 737.

While this is a civil suit, it is based upon an alleged violation of the Sherman Act, which is a highly penal statute. Thus a judgment under the pleadings in such a civil action must necessarily rest upon the conclusion from the facts that this highly penal statute has been violated.

It is quite useless to review the decisions of the courts which condemn combinations and conspiracies in restraint of trade in violation of the Sherman Act. Each case stands upon its own facts. Each of the reported cases where acts are condemned as combinations and conspiracies in violation of law are well supported by courses of conduct from which any discerning mind can at once come to the conclusion that the conduct complained of constituted a direct restraint upon competition, and artificially interfered with the natural course of trade. We submit that no such degree of proof is present in this case.

We do not feel that it is necessary to discuss the legal difference between reasonable and unreasonable restraint of trade. We contend that there is no proof submitted to show that any restraint was brought about through the dissemination by the Bureau of true, accurate market information as to past transactions. We feel, however, that what is the test of reasonable or unreasonable restraint of trade is not out of place in this case. *United States* v. *Addyston Pipe Co.,* 85 Fed. 271, 282.

There is no proof in the record that the interests of the public were injuriously affected, or that buyers ever complained that they were being penalized by prices quoted

by the members of the Council. Further, there is no proof in the record that crushers outside of the Council were injuriously affected in their efforts to compete for the business of the crusher defendants. Those who are injured are the first to complain, and the Government submitted no testimony that any one had complained against the operations of the Bureau.

It is a matter of record, however, that buyers called by the Government and the defendants testified that they never considered the prices quoted by the defendant crushers while members of the Linseed Oil Council were out of line with price of flaxseed. This fact we assert ought to be proof sufficient that no one was burdened by reason of the exchange of accurate market information set forth in this case. *United States* v. *United States Steel Corporation,* 223 Fed. 154, 155.

It is true that the crushers did have the benefit of accurate information which assisted each in individually forming his own judgment as to the prices he should charge for his product. Every one who has anything to sell always seeks to ascertain what others are selling the same products for. There can be no violation of law in that. Can it be said to be unlawful if persons having like products for sale agree among themselves to inform each other as to the prices that have prevailed? Nothing further was done by the linseed oil crushers. They had freedom to contract, to do a lawful thing, and they did nothing more. Not a scintilla of evidence has been presented in this case that indicates, by inference or otherwise, that the exchange of information by the linseed oil crushers brought about an artificial influence on the linseed oil market. *United States* v. *United States Steel Corporation,* 251 U. S. 417.

The Court cannot, and will not, decide this case on guess or presumptions not supported by evidence, but can, of course, only find the existence of a purpose to artificially

influence prices, and the affecting thereof, by a clear and
satisfying preponderance of the evidence.

Applying the test of this Court, in the language of the
opinion in *Board of Trade of Chicago* v. *United States,*
246 U. S. 231, how can there be spelled out of the conduct
of the linseed oil crushers any purpose or effect of lessening
or suppressing competition? *State* v. *Arkansas Lumber
Co.,* 260 Mo. 212.

We assert that before the Court can find an unlawful
use by the defendants of such information, it is necessary
to find that there was an agreement, express or implied, to
unlawfully use the information. *United States* v. *Prowaty
& Sons,* 251 Fed. 375; *United States* v. *Naval Stores Co.,*
172 Fed. 455, 460.

So far as we can ascertain no court, state or federal,
has ever held that the collection and dissemination of true,
accurate market information, although obtained from and
exchanged by competitors, constituted a violation of law
as part of a combination or conspiracy in restraint of com-
petition or trade.

The matter of uniformity of price of itself means noth-
ing so far as proof of combinations or conspiracies is con-
cerned if there is no proof of effort to bring it about by
concerted action.

*Mr. Thomas M. Debevoise,* with whom *Mr. Eugene
Congleton* and *Mr. Willet M. Spooner* were on the brief,
for American Linseed Oil Co. et al., appellees.

The operation of the Linseed Crushers Council did not
affect the market price of linseed oil. The price of lin-
seed oil was determined by the market price of flaxseed.

The record shows, without any evidence to the con-
trary, that prices, spot and future, of linseed oil are di-
rectly based upon prices, spot and future, of flaxseed; that
flaxseed, like wheat and other commodities of like nature,
is bought and sold on open exchanges and that fluctua-
tions in flaxseed prices cannot be artificially controlled.

The members of the Linseed Crushers Council during its existence were actively competing against each other, and although there were periods during the operation of the Council, just as there had been before the Council was formed, when the prices of linseed oil were uniform, these periods of uniformity obtained at times when the market was inactive and did not obtain when the market was active and sales were large.

The correspondence between the Armstrong Bureau and the members of the Linseed Crushers Council indicates clearly that the individual council members were actively competing with each other, and the very insistence by the individual members that the reports of price changes should be prompt and accurate negatives the existence of any understanding or agreement to maintain arbitrary prices.

The Government's argument based upon the uniformity of prices at various periods during the operation of the Council is palpably misleading.

The decision of the court below, to the effect that the facts adduced at the trial did not constitute a direct and undue restraint of competition among members of the Linseed Crushers Council, supported by a great preponderance of evidence, is entitled to great weight in this Court. *United States* v. *United Shoe Machinery Co.,* 247 U. S. 32; *Adamson* v. *Gilliland,* 242 U. S. 350; *Davis* v. *Schwartz,* 155 U. S. 631; *Tilghman* v. *Proctor,* 125 U. S. 136.

*Mr. Wm. J. Matthews* and *Mr. Hugh T. Martin,* by leave of court, filed a brief as *amici curiae.*

MR. JUSTICE MCREYNOLDS delivered the opinion of the Court.

By an original bill filed June 30, 1920, the United States charged that appellees—defendants below—were parties

to a combination in restraint of interstate trade and commerce forbidden by the Sherman Act, and asked that they be enjoined from continuing therein. The court below held the combination lawful and dismissed the bill. 275 Fed. 939.

The defendants are twelve corporations, commonly referred to as " crushers," with principal places of business in six different States, which manufacture, sell and distribute linseed oil, cake and meal; and Julian Armstrong, who operates at Chicago under the name, Armstrong Bureau of Related Industries. This Bureau conducts a so-called "exchange" through which one subscribing manufacturer may obtain detailed information concerning the affairs of others doing like business. The defendant " crushers " constitute one of the groups who contract for this service. They manufacture and distribute throughout the Union a very large part of the linseed products consumed therein and prior to the challenged combination were active, unrestrained competitors. Some time in September or October, 1918, each of them entered into an identical written "Subscription Agreement" with the Armstrong Bureau, and a year thereafter signed another, not essentially different. The latter is summarized and quoted from below.

After stating that " the matter contained herein is for the exclusive and confidential use of the subscriber," the agreement recites that it and other " crushers " of flaxseed desire promptly and economically to secure from and through the Bureau the following things, " which will promote better and more safe, sane, and stable conditions in the linseed oil, cake, and meal industry and increase its service to the commonwealth: " Comprehensive data as to market, trade and manufacturing conditions in the linseed oil industry; economies in manufacture and sale by frank exchange of accurate information; the latest authentic information concerning the credit of buyers; a

broadĕr market for cake and meal; establishment of uniform cost accounting systems; fair and just freight tariffs and classifications; definite standardization of the products of the industry; economies in the development of foreign markets and increase of sales therein; stabilization of the flaxseed market so far as lawful; shipment of cake and meal to the consumer from the nearest point of production.

*The contracting " crusher " agrees:*

To subscribe for the Bureau's service for twelve months and thereafter from year to year, subject to cancellation by either party upon thirty days' notice, and pay therefor a sum reckoned upon the amount of flaxseed milled by it, but not less than eleven hundred dollars annually.

That all information reported or received shall be purely statistical and relevant to past operations and no part of the Bureau's machinery will be used to fix prices, divide territory, limit sales, production or manufacture, or control competition.

That it will " promptly make, have made, forward, and have sent in and to said bureau, as and in the form required by this agreement, full, accurate, complete, signed, and certified reports of all said sales, quotations, and offerings or other information required by the bureau and full, correct replies or answers to any and all inquiries concerning the same or seeking any information in regard thereto."

That upon request it will " at once turn and have turned over to the bureau's auditor for examination all vouchers, books of account, correspondence, and such other evidence or documents as he may request or, in lieu of the same or any part thereof, such abstracts therefrom as he may designate, verified under oath and certified by a certified public accountant in good standing."

That " if any subscriber considers that it has good cause to question the report made by any other subscriber then

it may request an investigation or audit to be made by the bureau and, if considered proper by the bureau, it will be so made," the incident expense to be paid by the party found in error.

That it will deposit with the Bureau not less than one thousand nor more than ten thousand dollars of Liberty Bonds, according to its milling capacity.

That " should the undersigned subscriber fail, in any manner whatsoever, to comply with any of the terms of this agreement or with any and all reasonable requirements of said bureau, then it shall and does hereby forfeit to said bureau, at its election, all money paid for services and all further benefits and rights under this agreement; which forfeiture, for just cause, may be declared by said bureau, evidenced by written notice thereof mailed to said offender by U. S. registered mail, and such subscriber shall thereby forfeit all further right, title, or interest in and to said bonds (so on deposit) in whole or in part," subject to the right of appeal to a council, of three subscribers, which shall have power to review the entire matter, reinstate the offender or take such other final action as seems proper. No fine shall exceed the deposit with the Bureau.

That it will (a) " immediately, and when and as hereafter issued, deposit with the bureau all published price lists of the undersigned covering raw and boiled linseed oil, cake and meal; (b) also to report to the bureau by prepaid telegraph, and further confirm by mail, duplicate of all quotations made at variance with above price lists, giving better terms to the contemplated purchaser than those quoted; (c) with all reports made in compliance with the above paragraph ' b ' of quotations which amount to one carload or more of oil, cake or meal there shall also be reported at the same time and in the same manner the prospective buyer's name, address, and f. o. b. point of shipment; (d) in so far as the above reports ' a,'

' b ' and ' c ' do not disclose the following, the undersigned ' subscriber ' agrees to give the following information in connection therewith; that is: the exact prices, terms, and discounts—and whether made to jobber, dealer, or consumer—and in what quantities, carload or less than carload, and warehouse or mill prices; (e) also to promptly report all changes in and alterations or withdrawals of the above, of every kind whatsoever, that may be made; (f) also to promptly report by prepaid telegraph, and further confirm by mail, all orders received by the undersigned subscriber in response to special quotations made as above provided in paragraph ' c,' designating the quotation which is the basis of such order and any variance therefrom."

That " directly at the close of each day's business each subscriber shall mail by special delivery to the bureau a complete report of all its carload sales for that day of oil, cake or meal, not covered by its previous daily sales reports, which report shall disclose the quantity and kind, price and terms, and whether for immediate or future delivery, and if no sale has been so made, this fact shall be likewise reported."

That for the purpose of compiling a weekly sales report " a map of the United States shall be divided into zones as agreed upon by all of the subscribers to this service, and each subscriber at the conclusion of the week shall send to the bureau by special delivery, not later than the following Monday night, a compiled report of all of its sales of oil, cake or meal into each zone made during the period covered by such report and not previously so reported, specifically setting forth the following: (a-a) Total gallons of oil sold into each zone, also showing the total gallons and price per gallon received for such oil sold; (b-b) Total tonnage of cake and meal sold into each zone, also showing total weight and price received per ton for such cake or meal sold; (c-c) Sales reports on both

oil, cake and meal shall differentiate spot and future delivery, giving period of such futures."

That before the tenth day of each calendar month it will report to the Bureau the number of gallons of oil and the total tons of meal or cake on hand not covered by sale or contract.

That all information received from the Bureau or any meeting of subscribers will be treated as confidential.

*The Bureau undertakes, " with the help of each and every subscriber ":*

That it will use its best efforts to organize the linseed oil, cake and meal industry of the United States.

That it will afford its full statistical service for the exchange of information concerning quotations, sales, shipments, production and terms, also the service of its credit reporting department, will suggest from time to time the means for broader service; and will supply additional service whenever required, the rate to be agreed upon.

That the statistical service furnished shall be accomplished and provided by the use of special report forms conveying information on past transactions, which may be modified, changed and others provided, as experience suggests or as called for by the subscribers in any of their meetings and approved by the Bureau.

That the market information received by the Bureau will be cleared and relayed promptly to subscribers in good standing.

That it will send to subscribers, in the form of market letters, " news clippings " of interest to the industry and 'in accordance with the object and terms of the agreement.

*It is agreed by all:*

That " monthly meetings will be held of all subscribers hereto at some convenient center," with a representative of the Bureau, as Secretary, who shall present the matters pertaining to the industry to be therein openly discussed. Subscribers may send in notice of matters and

topics for discussion and if they accord with the agreement and object of the service the Bureau shall cause the same to be docketed and presented. "All subscribers shall report at these meetings on all matters and conditions within their knowledge affecting the industry and within the limits of this agreement that they may be there discussed for mutual benefit." "Any subscriber failing to attend in person or by said representative at each of these meetings and be in punctual and continued attendance thereon shall be subject to a fine of twenty-five dollars for each offense, the same to be collected by and payable to the bureau. This fine may be remitted by a majority vote of the members present at the meeting where it is incurred."

That "any subscriber who has made offerings or quotations to a prospective buyer and is advised by such buyer that it is not to be awarded such business shall have the right to immediately advise the bureau of such unsuccessful offering or quotation giving all details of such bid or offering, and may then request the bureau to bulletin all of its subscribers asking specific information regarding any quotation or sale to such prospective buyer by any of the other subscribers and the bureau, on receipt of such request, will immediately bulletin all subscribers asking therefor and on receipt of replies will send out a compilation report thereof to all subscribers, together with the details of sale, if such a sale has been reported, so that all subscribers, including the original inquirer, will have a complete report of this transaction. On receipt of a request for such specific information from the bureau, the undersigned subscriber will immediately reply to same giving full information as to any quotation or sale which it may have made to such a buyer and, if it has made none, so report."

That each subscriber will furnish the Bureau, upon request, information pertaining to any buyer of linseed

oil, cake and meal and may request the Bureau to secure like information from all other subscribers, whenever it shall have an order or an account with, or an inquiry from, the buyer, and this information will be promptly relayed to all interested subscribers.

When an adequate number of subscriptions had been obtained (September, 1918) the organization began vigorously to function according to letter and spirit of the agreement. It will suffice to state a few of the steps taken.

The United States were divided into eight zones for price quoting; and it was stipulated that each member should quote a basic price for zone number one and should add thereto one, two, four, six, seven, eight and eleven cents, respectively, for the others. At subscribers' meetings regularly held " matters pertaining to the industry " were discussed; members were " put on the carpet " and subjected to searching inquiry concerning their transactions. A meeting held October 29, 1919, adopted the following rule: " In order to provide that the daily market information as relayed by the bureau shall at all times contain the fullest measure of news value, it is agreed that hereafter no council member shall dispatch changes in his prices as last filed with the bureau to more than one buyer without instantly thereafter telegraphing such full and complete information to the bureau as, and in the form, required by the service contract." Another meeting " resolved that it now be recorded that the recommended terms of this council for the sale of oil be 1% discount for cash settlement in 10 days, or 30 days net trade acceptance from date of shipment, and in order that a specific list of the terms of sale of all the council members may now be compiled and distributed, it is further resolved that all council members shall send to the bureau, not later than January 27th, a full explanation of the terms of sale as quoted by them to their trade."

The Bureau displayed great industry in making in--quiries, collecting information, investigating the smallest derelictions and giving immediate advice to subscribers. Hundreds of so-called "market letters," relating to divers transactions, were sent to subscribers. A sale of two barrels of oil below schedule was deemed worthy of special attention. Also from time to time it gave counsel concerning "unfair merchandising" and the necessity for establishing sound policy by constructive coöperation. The following letters—224 and 245—dated February 5 and 12, 1919, are characteristic.

"Will all council members please reply promptly and fully through the bureau whether or not they made the sale in question to the following?

New York, N. Y., Feb. 3, 1919.

Armstrong Bureau of Related Industries, Chicago.

Gentlemen: Our Chicago manager advises us that under date of February 1st the Enterprise Paint Mfg. informed him that they had bought 10 barrels linseed oil at less than $1.46 from another crusher in the Chicago territory. Will you kindly bulletin the subscribers with a view to finding out if any of the crushers sold this lot at under their published price?

Yours very truly, American Linseed Company."

"In the file of replies today completed, 11 subscribers state, in effect, that they have neither quoted nor sold the Enterprise Paint Mfg. Co. The sale was apparently made by subscriber No. 6, whose letter follows:

Minneapolis, Minn., Feb. 6, 1919

Armstrong Bureau of Related Industries, Chicago.

Gentlemen: Replying to your market letter No. 224, we sold Enterprise Paint Manufacturing Company on February 3rd five barrels of bleached linseed oil at $1.50 delivered their plant. This is our price in the Chicago market at the present time.

Yours truly, Midland Linseed Products Co."

The prices of oil became more stable.

Defendants continued with meticulous care actively to carry out the several provisions of the agreement amongst them; and that they intended further to pursue the plan unless restrained is not denied.

The obvious policy, indeed the declared purpose, of the arrangement was to submerge the competition theretofore existing among the subscribers and substitute " intelligent competition," or " open competition; " to eliminate " unintelligent selfishness " and establish " 100 per cent confidence "—all to the end that the members might " stand out from the crowd as substantial co-workers under modern co-operative business methods."

In *American Column & Lumber Co.* v. *United States,* 257 U. S. 377, we considered a combination of manufacturers got up to effectuate this new conception of confidence and competition and held it within the inhibition of the Sherman Act because of inevitable tendency to destroy real competition, as long understood, and thereby restrain trade. Our conclusion there cannot be reconciled with the somewhat earlier opinion and judgment of the court below. They are in direct conflict.

The Sherman Act was intended to secure equality of opportunity and to protect the public against evils commonly incident to monopolies and those abnormal contracts and combinations which tend directly to suppress the conflict for advantage called competition—the play of the contending forces ordinarily engendered by an honest desire for gain. " The statute did not forbid or restrain the power to make normal and useful contracts to further trade by resorting to all normal methods, whether by agreement or otherwise, to accomplish such purpose. . . . The words restraint of trade should be given a meaning which would not destroy the individual right to contract and render difficult if not impossible any movement of trade in the channels of interstate commerce— the free movement of which it was the purpose of the

statute to protect." *United States* v. *American Tobacco Co.,* 221 U. S. 106, 179, 180; *Ramsay Co.* v. *Associated Bill Posters,* 260 U. S. 501; *Federal Trade Commission* v. *Sinclair Refining Co.,* 261 U. S. 463.

Certain it is that the defendants are associated in a new form of combination and are resorting to methods which are not normal. If, looking at the entire contract by which they are bound together, in the light of what has been done under it the Court can see that its necessary tendency is to suppress competition in trade between the States, the combination must be declared unlawful. That such is its tendency, we think, must be affirmed. To decide otherwise would be wholly inconsistent with the conclusion reached in *American Column & Lumber Co.* v. *United States, supra.*

The record discloses that defendants, large manufacturers and distributors—powerful factors in the trade— of commodities restricted by limited supplies of raw material (linseed), located at widely separated points and theretofore conducting independent enterprises along customary lines, suddenly became parties to an agreement which took away their freedom of action by requiring each to reveal to all the intimate details of its affairs. All subjected themselves to an autocratic Bureau, which became organizer and general manager, paid it large fees and deposited funds to insure their obedience. Each subscriber agreed to furnish a schedule of prices and terms and adhere thereto—unless more onerous ones were obtained—until prepared to give immediate notice of departure therefrom for relay by the Bureau. Each also agreed, under penalty of fine, to attend a monthly meeting and report upon matters of interest to be there discussed; to comply with all reasonable requirements of the Bureau; and to divulge no secrets.

With intimate knowledge of the affairs of other producers and obligated as stated, but proclaiming them-

selves competitors, the subscribers went forth to deal with
widely separated and unorganized customers necessarily
ignorant of the true conditions. Obviously they were not
*bona fide* competitors; their claim in that regard is at war
with common experience and hardly compatible with fair
dealing.

We are not called upon to say just when or how far
competitors may reveal to each other the details of their
affairs. In the absence of a purpose to monopolize or the
compulsion that results from contract or agreement, the
individual certainly may exercise great freedom; but con-
certed action through combination presents a wholly dif-
ferent problem and is forbidden when the necessary tend-
ency is to destroy the kind of competition to which the
public has long looked for protection. The situation here
questioned is wholly unlike an exchange where dealers
assemble and buy and sell openly; and the ordinary prac-
tice of reporting statistics to collectors stops far short of
the practice which defendants adopted. Their manifest
purpose was to defeat the Sherman Act without subject-
ing themselves to its penalties.

The challenged plan· is unlawful and an injunction
should go against it as prayed by the original bill. The
cause will be remanded to the court below with instruc-
tions to issue such an injunction and promptly to take
any further action necessary to carry this opinion into
effect.

*Reversed.*