**ADMIRAL THEATRE CORPORATION, a corporation, Plaintiff,**

**v.**

**PARAMOUNT FILM DISTRIBUTING CORPORATION, a corporation, Loew's, Incorporated, a corporation, Warner Bros. Pictures Distributing Corporation, a corporation, and Twentieth Century-Fox Film Corporation, a corporation, Defendants.**

No. 42–53.

United States District Court
D. Nebraska, Omaha Division.

Nov. 21, 1955.

688

Paul F. Good, Monsky, Grodinsky, Good & Cohen, Omaha, Neb., for plaintiff.

Yale C. Holland, Kennedy, Holland, DeLacy & Svoboda, Omaha, Neb., for defendant Paramount.

Seymour L. Smith, Robert L. Smith, Omaha, Neb., for defendants Loew's, Warner Bros. and Twentieth Century-Fox Film Corp.

RIDGE, District Judge.

Plaintiff charges defendants, distributors of motion picture films, with conspiracy to restrain trade in violation of the Sherman and Clayton Acts, 15 U.S.C.A. §§ 1–15, and seeks recovery of treble damages as a consequence thereof.

At the commencement of the alleged conspiracy and throughout the period of its existence, plaintiff exhibited second-run feature motion pictures in its Admiral Theatre in Omaha, Nebraska, "day and date" with certain other theatres, which at all times were admittedly in substantial competition with it. ("Day and date," "availability", "run", "clearance", and other technical terms used

herein are spelled out, as are the legal identity of parties, in the stipulation of facts filed herein. To shorten this memorandum, those interested are referred thereto.)

The object of the conspiracy here charged, tersely stated, is: The defendants, and four other distributors of motion pictures, and one Goldberg, not joined as parties herein, concertedly denied and refused plaintiff, after demand therefor, *the right to negotiate for the exhibition of feature motion pictures in the Admiral Theatre, on an exclusive second-run basis, with reasonable clearance over other theatres in Omaha, Nebraska, in substantial competition with the Admiral.* Had the defendants and others not so conspired, and had plaintiff been successful by individual negotiations with the distributors and induced them to give it the "right" to exhibit feature pictures on exclusive second run, with reasonable clearance, at the Admiral Theatre, plaintiff says it would have been enabled to increase the admission price it charged at the Admiral Theatre over that which it charged while showing second-run features "day and date" with theatres in substantial competition with it, and its theatre attendance would have been increased thirty-five per cent. Thus its claim to actual damages.

Specific acts of alleged discrimination, favoritism and failure to negotiate "theatre-by-theatre" are asserted by plaintiff. As will hereafter more fully appear, such matters are merely relied on by plaintiff as evidence of the existence, and not the ultimate fact of impact, of the conspiracy charged on plaintiff's business of operating the Admiral Theatre. Whether a conspiracy exists as plaintiff contends is, of course, a question of ultimate fact to be established by evidence, but whether the facts bring the defendants' acts within the prohibition of the Sherman Act is a question of law. Gary Theatre v. Columbia Pictures Corp., 7 Cir., 120 F.2d 891, 894.

Defendants have filed motion for summary judgment. At pre-trial conference the parties were ordered to state, and they have cooperatively stated, their respective theories of claim and defense. Certain evidentiary facts have been stipulated. Depositions of the parties, containing admissions of fact, are on file. These proceedings, then, have reached a stage tantamount to that as if opening statements had been made at the trial of this case before a jury, if a jury had been empaneled, and we were called upon to rule as a matter of law whether plaintiff has any claim against the defendants. The instant motion for summary judgment is considered in the above background. In so doing, we give plaintiff every favorable, reasonable inference from the facts pleaded, stipulated, contained in the depositions, and stated at pre-trial conference. Consequently, we assume, as we must, the existence of a combination and conspiracy among the defendants, having as its object a refusal to negotiate as above stated. That is the claim, and only claim, asserted or made by plaintiff for damages to its "business or property" because of the Sherman Act violation here charged.

The Admiral Theatre Corporation, (organized under the laws of Nebraska) is the owner and operator of the Admiral Theatre, a "neighborhood" or "suburban" house, located in about the center of population and transit facilities in Omaha, Nebraska. It has a seating capacity of 972; is very modern and up-to-date in its appointments and equipment; with the Chief Theatre, hereinafter adverted to, it is one of the newest motion picture theatres in that City. The "Admiral" was opened in 1941. At that time there were twenty-four other motion picture theatres in Omaha. The plaintiff's cause of action is particularly addressed to certain theatres owned and operated by R. D. Goldberg Theatres Corporation (hereinafter referred to as Goldberg). At the time the Admiral Theatre began operations the Goldberg corporation owned and operated, in Omaha, Nebraska, among other motion picture theatres, the "Military", "Avenue" and "Dundee" Theatres. Each

of said Goldberg theatres is located 1.8, 1.4 and .9 miles, respectively, from plaintiff's Admiral Theatre, and is, according to the plaintiff's admission and theory of action, in substantial competition with the latter. (We shall also assume substantial competition to be an established fact herein, though all the defendants do not specifically admit the existence thereof. However, they do not categorically deny plaintiff's claim to the existence of substantial competition. From the record herein, we do not perceive how there can be any real controverted issue regarding that matter.) All contracts and bookings for motion pictures for the Goldberg theatres are made by one central office under the personal direction and control of Ralph D. Goldberg.

When plaintiff opened the Admiral Theatre it ran into some difficulty in obtaining second-run pictures from the eight major distributors of motion pictures in Omaha. It was able to get some second-run pictures from Fox, and some from Warner Bros. For the most part, it began exhibition with Republic, feature pictures. At that time the Military, Avenue and Dundee were second-run operations in Omaha. In October, 1944, some of the major companies negotiated with Admiral for "day and date" availability with the above three Goldberg theatres. The Admiral then went to a policy of a divided week, exhibiting second-run pictures on Saturdays, Sundays and some other days, and a later run of pictures for the rest of the week. Finally, after repeated demands therefor, plaintiff, in the latter part of 1946, was able to obtain second-run pictures from all the major distributors of motion pictures in Omaha. Some distributors at that time granted plaintiff "day and date" availability with the above three Goldberg theatres and some a later availability, of as much as fourteen days after Goldberg's availability to second-run pictures. However, to obtain second-run feature pictures from Paramount and Metro, plaintiff was required to "split the product" of those companies with Goldberg's Avenue or Dundee Theatre.

That is, plaintiff obtained second-run pictures from Paramount, and Metro, which it could only play "day and date" with either the Avenue or the Dundee; while at the same time Goldberg's Military Theatre was afforded an "open" availability and could, and did at times, play the same feature picture "day and date" with the Admiral. More often it played other feature pictures. This, plaintiff charges, permitted Goldberg to receive one-half the product of those two distributors for exhibition in its Military Theatre without any competition in respect thereto from the Admiral Theatre, while at the same time plaintiff's Admiral Theatre was always subject to competition from at least two Goldberg theatres because it was required to "split" the product of Paramount and Metro. It appears, however, that as to the product of Warner Bros. and Fox, plaintiff, at least from and after 1946, was permitted to play the same "day and date" with the Goldberg theatres.

In April, 1947, plaintiff built and opened another motion picture theatre in South Omaha, "The Chief." It is owned by plaintiff, but operated by The Chief Theatre Corporation, and managed by Ralph R. Blank, who is also the managing officer of plaintiff's Admiral Theatre. "The Chief" began operation as a second-run house and continued so until November, 1952. Since that date it has exhibited feature pictures first run.

In early 1948, Goldberg's Dundee Theatre dropped out of second-run operation in Omaha. It went to a policy of "art" and "special interest" pictures. This then was the situation respecting second-run exhibition of motion pictures in Omaha in September, 1948. Five motion picture theatres in downtown Omaha were exhibiting first-run pictures: the Orpheum, Omaha, Paramount, Brandeis and the State; the latter owned and operated by Goldberg. The plaintiff's Admiral and Chief, and Goldberg's Avenue and Military then exhibited second-run pictures forty-five days after first run, with "clearance" over subsequent-run

operations. All other Omaha suburban theatres played behind the Admiral, Chief, Avenue and Military, that is to say, third run or later. At that time, plaintiff's Admiral Theatre was playing the product of Warner Bros. and Fox, "day and date" with Goldberg's Avenue and Military Theatres. The product of Paramount and Loew's was then exhibited on a "split of product" policy between said three theatres. Plaintiff's Chief Theatre was exhibiting the product of all distributors on second-run "open" availability.

On September 1, 2 and 3, 1948, plaintiff, by mail, caused the following demands to be made on the four distributor-defendants herein. The demand served on Loews, Incorporated, on September 1, 1948, reads:

"For many months last past you have maintained a system of runs and clearances for subsequent runs in Omaha by which motion pictures which you distribute are split for second run exhibition between the Dundee and Military theatres on the one hand and the Admiral theatre on the other. On behalf of the Admiral theatre, I object to this system on the ground that it is illegal and deprives the Admiral theatre of second run privileges which are essential to its successful operation, and for other reasons.

"Demand is hereby made on behalf of the Admiral theatre, Omaha, Nebraska, for the opportunity to negotiate for motion pictures distributed by you for exhibition in Omaha, Nebraska, on the basis of a run subsequent only to the first run in down town Omaha theatres (Paramount, Orpheum, Omaha, RKO-Brandeis and State) allowing a reasonable clearance after such first run.

"Further demand is made that reasonable clearance may be negotiated over subsequent runs in Omaha, in theatres in substantial competition with the Admiral theatre, sufficient to protect the exhi-

bition rights on the run that may be granted as result of such negotiations.

"The Admiral Theatre is superior to any other theatres in Omaha, except the said down town first run Omaha theatres, and except the Chief theatre, in character, and location, including size, type of entertainment, appointments, transit facilities, rental terms and license fees paid, and revenues derived by distributors and in some of these elements is even superior to some of such down town theatres.

"This demand is being made simultaneously with a similar demand being made on behalf of the Chief theatre of Omaha, which is operated under the same management as the Admiral theatre, and it is to be understood that the management desires that opportunity be afforded for negotiations so that the same run might be made available both for the Admiral and the Chief.

"I feel that the Admiral and Chief theatres are rightfully entitled to the right to negotiate for pictures for the run herein requested and I am firmly of the conviction that selling pictures on this run to these theatres would clarify the selling of your company's product in Omaha and would in the long run result in much added revenue to your Company."

A similar demand was served on Paramount on September 2, 1948. The only difference therein is that the letter begins, "Commencing recently you have maintained," instead of, "For many months last past you have maintained," etc. The demand served on Warner Bros. Pictures, Inc. and Twentieth Century-Fox Film Corporation reads as follows:

"Demand is hereby made on behalf of the Admiral Theatre, Omaha, Nebraska, for the opportunity to negotiate for motion pictures distributed by you for exhibition in Omaha,

Nebraska, on the basis of a run subsequent only to the first run in down town Omaha theatres (Paramount, Orpheum, Omaha, RKO-Brandeis and State) allowing a reasonable clearance after such first run.

"Further demand is made that reasonable clearance may be negotiated over subsequent runs in Omaha, in theatres in substantial competition with the Admiral Theatre, sufficient to protect the exhibition rights on the run that may be granted as result of such negotiations.

"The Admiral Theatre is superior to any other theatres in Omaha, except the said down town first run Omaha theatres, and except the Chief Theatre, in character and location, including size, type of entertainment, appointments, transit facilities, rental terms and license fees paid, and revenues derived by distributors, and in some of these elements is even superior to some of such down town theatres.

"This demand is being made simultaneously with a similar demand being made on behalf of the Chief Theatre of Omaha, which is operated under the same management as the Admiral Theatre, and it is to be understood that the management desires that opportunity be afforded for negotiations so that the same run might be made available both for the Admiral and the Chief.

"I feel that the Admiral and Chief Theatres are rightfully entitled to the right to negotiate for pictures for the run herein requested and I am firmly of the conviction that selling pictures on this run to these theatres would clarify the selling of your company's product in Omaha and would in the long run result in much added revenue to your company."

In its complaint the plaintiff charges that "at some date during the last four months of 1948, the said distributors, including the distributor-defendants and the other distributors listed in Article IX hereof, (the four major distributors, R.K.O., Universal, United Artists and Columbia, who are not made parties herein) and the Goldberg interests, entered into a conspiracy in violation of the antitrust laws of the United States. After setting out certain background matter and essential Sherman Act jurisdictional averments, the complaint alleges, in paragraph XII, as follows:

" * * * the said distributors, including the distributor-defendants, and the other distributors listed in Article IX hereof, and the Goldberg interests entered into a conspiracy in violation of the antitrust laws of the United States, * * * for the following purposes and upon the following terms:

"(1) To refuse to recognize the superiority of the plaintiff's theatre over the Avenue and Military Theatres, and to refuse to negotiate with plaintiff on the basis of clearance for said Admiral Theatre of a reasonable amount over said Avenue, Military and Dundee Theatres.

"(2) To give to said Avenue and Military Theatres an artificial competitive advantage over said Admiral Theatre.

"(3) To deprive the plaintiff as owner of said Admiral Theatre of the value of its investment in location, building and appointments, all of which were and are superior to those of the Avenue and Military Theatres.

"(4) To prevent the plaintiff as owner of said Admiral Theatre from enjoying, by means of charging a higher admission price, the legitimate profits to which it was entitled because of the service and benefits to the public, afforded by its location, appointments, beauty of building and auditorium, auto park, and other improved facilities for the convenience, comfort and welfare of its patrons.

"(5) To use the greater buyer power of the seven theatres of the

Goldberg chain as against only two theatres affiliated together, to wit, the Admiral and Chief, to prevent the plaintiff from enjoying the benefits of its investment as aforesaid."

Paragraph XIII of the amended complaint reads:

"Plaintiff's admission prices since said first day of September, 1948, have been as follows:

"Forty Cents (40¢) maximum until September, 1950, then Forty-four Cents (44¢) until November, 1952.

"If plaintiff had been granted clearance over the Avenue, Military and Dundee Theatres, plaintiff would have been able to charge an admission price of Fifty Cents (50¢), not only without loss of patronage, but also would have been able to increase its patronage by at least thirty-five per cent (35%) with a consequent total increase in revenue as hereinafter alleged."

The overt acts alleged to have been committed by defendants, in pursuance of the conspiracy, are charged in Paragraph XIV, as follows:

"The members of the conspiracy hereinbefore described in Paragraph XII hereof, and each of them, committed overt acts pursuant to such conspiracy as follows:

"(1) Said distributors each separately, refused repeatedly and on each occasion when plaintiff attempted to negotiate for pictures after September 1, 1948, to grant plaintiff clearance over said other theatres. Said occasions of negotiation occurred with each of said distributors at least once each month in 1948, after September 1, 1948, regularly several times a year in 1949 and occasionally thereafter.

"(2) Said distributors and each of them sold to the Goldberg interests exhibition rights for feature pictures for display in the Avenue and Military Theatres day and date with the Admiral Theatre. Said sales were made by each of said distributors several times in each year after 1948.

"(3) With the co-operation of said defendants, said Goldberg interests used the combined buying power of all theatres owned and controlled by them to obtain an unfair competitive advantage in relation to plaintiff, and thereby obtained display rights from the defendants of pictures day and date with said Admiral Theatre.

"(4) Some of said distributor defendants licensed feature pictures to some of said Goldberg Theatres at a low, flat rental to play day and date with the Admiral Theatre, while exacting from the Admiral Theatre a high percentage contract. In practically all instances when pictures were sold to the Admiral Theatre on a flat rental basis, the amount exacted was much higher than that paid by the Avenue, Military or Dundee Theatre for display of the same picture day and date with the Admiral.

"(5) For a period of time lasting approximately ten months, and commencing on or about July 26, 1948, defendant Paramount Film Distributing Company allotted its pictures as they became available at second run in Omaha, but offering all of them to the Avenue on the earliest second-run availability, so that one of such pictures would play at the Admiral and Avenue day and date, the next one at the Avenue and Military day and date, and so on alternately with others as they became available. Sometimes during said period, such allotments were in blocks of two or three, with similar alternations. When defendant Paramount Film Distributing Corporation made a picture available for display at the Avenue and Military in such manner, day and date at the earliest second-run availability, plaintiff was not permitted to display it at the Admiral until seven days after it had closed its run at

the Avenue and Military, or at such of said theatres as chose to display it on such availability.

"(6) For a period of time lasting approximately 27 months, and commencing on or about December 22, 1947, defendant Loew's Incorporated allotted its pictures as they became available at second run in Omaha, alternately as between the Admiral on the one hand, and the Military and Dundee on the other, but offering all of them to the Avenue on the earliest second-run availability so that one of such pictures would play at the Admiral and Avenue day and date, the next one at the Military, Dundee and Avenue day and date, and so on alternately with others as they became available. Sometimes during said period, such allotments were in blocks of two or three, with similar alternations. When said defendant Loew's, Incorporated made a picture available to the Military, Dundee and Avenue in such manner, day and date on the earliest second-run availability, plaintiff was not permitted to display it at the Admiral until at least seven days after it had closed its run at the Military, Dundee and Avenue, or at such of said theatres as chose to display it on such availability."

By Paragraphs XV, XVI and XVII of the amended complaint plaintiff seeks to bring the conspiracy above charged, and certain conduct of the defendants alleged in Paragraphs X and XI thereof, within the ambit of a "large, nationwide conspiracy among the defendants" adjudicated in the United States District Court for the Southern District of New York, "Civil Action Equity No. 87–273," commonly referred to as United States v. Paramount. See 66 F.Supp. 323; findings of fact and conclusions of law, D.C., 70 F.Supp. 53; affirmed and reversed in parts, 334 U.S. 131, 68 S.Ct. 915, 92 L. Ed. 1260, D.C., 85 F.Supp. 881.

The actual damages claimed by plaintiff are for loss of revenue and profits from September, 1948, to November, 1952, in the sum of One Hundred Fifty Thousand Dollars ($150,000.00), and damages to reputation, good will and prestige of the Admiral Theatre in the sum of Fifty Thousand Dollars ($50,-000.00), trebled, together with a reasonable attorney's fee as provided by law. In November, 1952, the Admiral went to first-run operations and its demand for second-run features then ceased.

The defendants by their answers of course deny the existence of any alleged conspiracy among them, collectively or singularly by agreement or conduct, and put in issue affirmative defenses of statutes of limitations and plaintiff's right to maintain the instant action under the Sherman and Clayton Acts. The pleadings and stipulation of facts reveal that no disputed issue of fact here exists as to the interstate character of the business of production, distribution, or exhibition of motion pictures.

Stripped of all ancillary and collateral facts, the pleadings, stipulations, depositions, and statements made at pre-trial conference conclusively reveal that the basic issue here is, and that plaintiff posits its claim of Sherman Act violation by the defendants on this single proposition: Defendants conspired to refuse plaintiff the right to negotiate for exclusive second-run exhibition of feature motion pictures at the Admiral Theatre, with reasonable clearance over other theatres in substantial competition with the Admiral between September, 1948, and November, 1952. From the limitation that plaintiff sets on its claim of "injury" to its "business or property" resulting from such an alleged violation of the Act, we believe the first matter for our consideration and determination is whether the damages so claimed are such as can be recouped by plaintiff in this action, in light of the mischief which the Sherman Act was intended to destroy.

With commendable frankness, plaintiff states: "In order to avoid misunderstanding we wish to emphasize the fact that plaintiff *does not* claim that any exhibitor can, as a matter of right, demand

a preferred run with or without clearance" from any distributor of motion pictures. "It is our contention that such runs are to be arrived at by negotiation in an open, free and competitive market without the handicap of a combination in restraint of trade." (Plff's Reply Brief on Motion for Summary Judgment, p. 11.) Thus, it is made crystal clear that plaintiff posits the conspiracy here charged as one "in restraint of trade" in violation of Section 1 of the Sherman Act, 15 U.S.C.A. § 1; and that, such is the *sine qua non* to its claim for damages.

It must be kept in mind "that only such contracts and combinations are within the act as, by reason of intent or the inherent nature of the contemplated acts, prejudice the public interests by unduly restricting competition or unduly obstructing the course of trade." Nash v. United States, 229 U.S. 373, 376, 33 S.Ct. 780, 781, 57 L.Ed. 1232. "Founded upon broad conceptions of public policy, the prohibitions of the statute [Sherman Act] were enacted to prevent not the mere injury to an individual which would arise from the doing of the prohibited acts, but the harm to the general public which would be occasioned by the evils which it was contemplated would be prevented, and hence not only the prohibition of the statute, but the remedies which it provided, were coextensive with such conceptions." Wilder Mfg. Co. v. Corn Products Co., 236 U.S. 165, 174, 35 S.Ct. 398, 401, 59 L.Ed. 520. "The purpose of the Sherman Act is to prohibit monopolies, contracts and combinations which probably would unduly interfere with the free exercise of their rights by those engaged, or who wish to engage, in trade and commerce—in a word to preserve the right of freedom to trade." United States v. Colgate & Co., 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992. "The fundamental purpose of the Sherman Act was to secure equality of opportunity and to protect the public against evils commonly incident to destruction of competition through monopolies and combinations in

restraint of trade." Charles A. Ramsay Co. v. Associated Bill Posters Ass'n, 260 U.S. 501, 502, 43 S.Ct. 167, 168, 67 L.Ed. 368. "The Sherman Act was intended to secure equality of opportunity, and to protect the public against evils commonly incident to monopolies, and those abnormal contracts and combinations which tend directly to suppress the conflict for advantage called competition—the play of the contending forces ordinarily engendered by an honest desire for gain." United States v. American Linseed Oil Co., 262 U.S. 371, 388, 43 S.Ct. 607, 611, 67 L.Ed. 1035. Each Sherman Act violation of course must be resolved from a particular consideration of the circumstances and acts found to exist in each individual case, United States v. Socony-Vacuum Oil Co., 7 Cir., 105 F.2d 809, and the courts must proceed step by step, applying retroactively the standard proper for each situation as it comes up, to ascertain whether a violation of the Act exists. American Tobacco Co. v. United States, 221 U.S. 106, 31 S.Ct. 632, 55 L.Ed. 663. To recover treble damages under the Act it must be shown that not only the individual plaintiff has sustained damages because of an alleged violation, but that public rights have also been violated. Cf. Emich Motors Corp. v. General Motors Corp., 7 Cir., 181 F.2d 70, certiorari denied 340 U.S. 808, 71 S.Ct. 62, 95 L.Ed. 594; Glenn Coal Co. v. Dickinson Fuel Co., 4 Cir., 72 F.2d 885; Abouaf v. J. D. & A. B. Spreckels Co., D.C., 26 F.Supp. 830; Tivoli v. Paramount Pictures, D.C., 80 F.Supp. 800, 807; Riedley v. Hudson Motor Car Co., D.C., 82 F.Supp. 8. As operators of the Admiral Theatre in Omaha, Nebraska, plaintiff had a right to compete for any playing position the defendants afforded, or offered to other theatre operators in Omaha, Nebraska, but it had no vested right to be awarded, or protected in, any certain playing position that was not available to its competitors. Cf. Bigelow v. RKO Radio Pictures, 7 Cir., 162 F.2d 520, 524. Under the Sherman Act the defendants, "whatever system or method [was] utilized" in the distribu-

tion of feature motion picutres in Omaha, Nebraska, were obliged to "make certain that plaintiff in the procurement of pictures" for its Admiral Theatre was "afforded every opportunity, right and privilege accorded a competitor, that and no more." Loew's, Inc., v. Milwaukee-Towne Corporation, 7 Cir., 201 F.2d 19, loc. cit. 25. We cannot agree with plaintiff, that it is the law that it had a right to negotiate and, as a part of such negotiation, secure a preferred position in the procurement and exhibition of feature pictures that was not available in a free and open market to other theatres in substantial competition with it. The very opposite is the law as laid down in United States v. Paramount, supra.

While it is here charged that the refusal of plaintiff's claimed right to negotiate for exclusive second-run features, with clearance over other theatres in Omaha, in substantial competition with its Admiral Theatre, was in furtherance of conspiracy, it must be kept in mind that the only allegation and contention made as to any "public interest" invaded as a consequence of that same conspiracy, is as contained in Paragraph XII, (4), of the amended complaint, supra. That conspiracy is claimed to have had this effect on the public interest: that plaintiff, as the owner of said Admiral Theatre, was prevented "from enjoying, by means of charging a higher admission price, the legitimate profits to which it was entitled because of the service and benefits to the public, afforded by its location, appointments, beauty of buildings and auditorium, auto park, and other improved facilities for the convenience, comfort and welfare of its patrons." No other claim to invasion of the "public interest" as a consequence of the conspiracy here asserted and charged is made in the amended complaint, or otherwise, either generally or specially. The record now before us conclusively reveals that the "public" was afforded, before and during the entire period that plaintiff says the conspiracy existed, in a free and open market, the opportunity and privilege of enjoying all the facilities plaintiff connects with its Admiral Theatre, and to view second-run feature pictures therein, at an admitted reduced admission price over that which the plaintiff says the public would have been charged for viewing the same class of second-run pictures in that theatre, but for the existence of this alleged conspiracy. Plaintiff does not, and it cannot, claim any other invasion of "public interest" in this Sherman Act litigation than as immediately set out above. Hence, we do not have a case of conspiracy presently imposing "unreasonable clearance"; the denial to an exhibitor of a run that is available to other theatres in substantial competition; or any of the other discriminatory features that were the object of the conspiracy and adjudicated as being detrimental to public interest in United States v. Paramount, supra. What was said by the Seventh Circuit Court of Appeals, in Loew's, Inc., v. Milwaukee Towne Corporation, 201 F.2d 19, at page 24, is very apposite here:

"There is not a word in the original opinion of the Statutory Court [United States v. Paramount] D.C., 66 F.Supp. 323, in the opinion of the Supreme Court or in the later opinion of the Statutory Court, D.C., 85 F.Supp. 881, which affords the slightest support for the theory advanced in this case, that plaintiff is entitled to a position superior to that of its competitors."

Therefore, we believe the question here to be resolved boils down to this: whether the arrangement or combination of which plaintiff complains, is one which can be said to be in restraint of trade, i. e. injurious in any perceptible degree to the movie-going public in Omaha, Nebraska, or to any considerable portion of it, in tendency or effect; and whether the object of such conspiracy violated any legal right of the plaintiff protected by the Sherman Act. That, we perceive, presents a question of law that can and should be determined on the state of the instant record, by way of motion for summary judgment.

■ Assuming that plaintiff was denied the right to "negotiate" for exclusive second run, with reasonable clearance, as a consequence of the instant conspiracy, who can gainsay that the movie-going public in Omaha, Nebraska, where the impact of the conspiracy is placed and the area of competition is fixed, was not injured thereby. We do not believe one need enter the realm of economics to prove that the movie-going public was not injured by the prevention of an advancement of theatre admission prices which plaintiff says would have resulted, but for the conspiracy. We take judicial notice of the absence of any public interest in that matter. (Parenthetically, we say that had the distributors involved in United States v. Paramount, supra, been found to conspire not to grant any "prior runs" or any "clearance", the Expiditing Court there would not have been compelled to labor so much with that litigation.) The main purpose of the Sherman Act is to protect the public from unreasonable restraints of trade, and any right accruing to an individual by reason of a violation thereof is merely incidental. Cf. Glenn Coal Co. v. Dickinson Fuel Co., supra. When a violation of the Act is charged and the channels of commerce are not interrupted, nor any other like evil consequence injurious to the public is involved, a private right of action based on such claimed violation cannot be maintained, as a matter of law. Cf. Shotkin v. General Electric Co., 10 Cir., 171 F.2d 236; Riedley v. Hudson Motor Car Co., supra.

■ "Clearance" granted in the normal distribution of feature motion pictures, arrived at by negotiations, reasonable as to area and duration, is "a reasonable restraint permitted by the Sherman Act", although they "affect admission prices". United States v. Paramount Pictures, D.C., 66 F.Supp. 323, 341. It is also the law of that case that the reasonableness of a particular run or clearance *granted* must be determined in the concept of substantial competition, "theatre by theatre" and not on any other competitive basis. If "clearance" is a reasonable restraint on interstate commerce, then *a fortiori* no clearance is the absence of all restrain. If a conspiracy has as its object a total absence of restraint on interstate trade and commerce, how, it may be asked, can the public have any interest therein? It is impossible to think away the principal fact of this case, as it admittedly exists, that plaintiff wanted an exclusive second run, with clearance, and say that the combination of which plaintiff here complains is in anywise one in restraint of trade or commerce, having a public interest, when that classification or character of second-run exhibition of motion pictures was not available in the open market where plaintiff demanded that claimed right. The result which plaintiff imagines was the object of the conspiracy prevented plaintiff from securing a preferred position over theatres in substantial competition with its Admiral Theatre. It was not demanding equal treatment in a present available open market. That the denial of such objective fostered, and did not restrain, trade in the distribution of moving pictures is obvious. Two or more theatres always, simultaneously, exhibited feature pictures under the plan of distribution in existence in Omaha when plaintiff made the instant demands on defendants. By its own admission, plaintiff says it wanted the right to negotiate, and would have negotiated, so that only its Admiral Theatre would exhibit a given feature at a particular time and no other theatre in that City could exhibit that same feature until a reasonable period of clearance had expired. The period of plaintiff's exhibition and duration of clearance, reasonable or not, *a priori* establishes a restraint of trade over competition that was then existent in Omaha. To restrict plaintiff from that endeavor, even by conspiracy, was not a violation of the Sherman Act. Restriction alone is not enough to stamp a combination as illegal, it must be "unreasonable" in the sense that the common law understood that word before it is in violation of the Sherman Act. American Tobacco Co. v.

United States, 221 U.S. 106, 31 S.Ct. 632, 55 L.Ed. 663. "Injury" to business or property under the Act "implies violation of a legal right." Keogh v. Chicago & N. W. Ry. Co., 260 U.S. 156, 163, 43 S.Ct. 47, 49, 67 L.Ed. 183; Maltz v. Sax, 7 Cir., 134 F.2d 2, certiorari denied 319 U.S. 772, 63 S.Ct. 1437, 87 L.Ed. 1720. What right of plaintiff, or the public, was violated by the instant conspiracy? Plaintiff posits such "right" in refusal to "negotiate". Assume the defendants did so act; what relief could plaintiff have demanded or a court of law or equity granted because of that matter? Plaintiff concedes, as it must in light of controlling authority, that as an exhibitor it cannot and could not compel a distributor to give it a preferred run, or clearance, over any other theatre in substantial competition with it. That being true, then the object of the conspiracy here is one that invades no legal "right" of the plaintiff or the public. Conspiracy alone does not spell out liability under the Sherman Act in a private action for damages thereunder. Conspiracy, plus invasion of the public interest and violation of some legal right incident to the conduct of one's business, is the gravamen of a private action under the Act. So a conspiracy, the effect and tendency of which invades a non-existent claimed right cannot give rise to a private right of action under the Sherman Act. Where a private suitor asserts a claim under the Sherman Act for damages, the gravamen of the complaint is not the conspiracy. The damage for which a recovery is allowable is the damage which the suitor has suffered as a result of injury, i. e. a "violation of a legal right" by acts of the conspirators directed against him. Nalle v. Oyster, 230 U.S. 165, 182, 183, 33 S.Ct. 1043, 57 L.Ed. 1439; Burnham Chemical Co. v. Borax Consolidated, 9 Cir., 170 F.2d 569, 575; Foster & Kleiser Co. v. Special Site Sign Co., 9 Cir., 85 F.2d 742, 751; Northern Kentucky Telephone Co. v. Southern Bell Telephone Co., 6 Cir., 73 F.2d 333, 97 A.L.R. 133; Momand v. Universal Film Exchange,

D.C., 43 F.Supp. 996, 1007, and cases there cited.

Plaintiff here was not excluded from any market it had a right to. Except for the "split of product" matter, it received the same treatment from the defendant-distributors that its competitors received. Its theory of action is that it makes no claim for damages accruing as a result of "split of product" as we hereinafter point out. Therefore, no legal right of plaintiff was here invaded by the defendants. The claimed "right to negotiate" for an exclusive second run with clearance presupposes that such object of competition exists or existed in a free and open market and as between competitors, one of whom has, in pursuit of honest gain and fair dealing, the "right" to seek that object as an advantage over a competitor. Where there is no such object of competition in a given competitive area, an exhibitor has no right to demand such objective and thereby destroy competition in that area between theatres admittedly in substantial competition. The Sherman Act gives no such advantage to competitors. It was enacted, not to stifle, but to foster competition, not to permit one theatre group to destroy another theatre group by compelling one group to be relegated to a "third-run market." Neither plaintiff nor Goldberg was competing for first run. Nor were they "third-run market" competitors. They were both substantial competitors for second-run features, and they were both entitled thereto so long as they remained in that competitive classification, "that, and no more."

Plaintiff's contentions that the defendants, in carrying out the specific object of the conspiracy of which it complains, concertedly did not consider its Admiral Theatre on a "theatre-by-theatre" basis, as it was required by United States v. Paramount, supra, so to do; that they preferred Goldberg's theatres over the Admiral, because they dealt with Goldberg as an "old customer" or "circuit"; and that some time prior to the formation of the instant conspiracy they con-

spired and permitted Goldberg's State Theatre to exclusively exhibit feature pictures on a second-run basis in Omaha, and the other matters alleged in Paragraphs XII and XIV of the amended complaint, supra, are not the basis of any claim to actual damages plaintiff now asserts before this trial court, because of any Sherman Act violation. Conceding that the above acts and conduct of defendants are evidence, available to plaintiff to establish some other violations of the Sherman Act, yet the obvious fact is that Mr. Blank, the managing officer of plaintiff, in his deposition, and plaintiff's counsel at pre-trial conference, positively and unequivocally state that plaintiff's claim to damage is limited to those which it says it sustained as a result of a "conspiracy to refuse plaintiff the right to negotiate for an exclusive second run with reasonable clearance over theatres in substantial competition with it."

██ We hold plaintiff to that voluntarily assumed and proffered theory of action. With all the potentialities present in a Sherman Act case, federal district courts are admonished by the Judicial Conference of the United States to particularize the issues and theory of action in such cases, (see "Procedure in Anti-Trust and other Protracted cases," report adopted by Jud. Conf. of the U. S. Sept. 26, 1951) and that in justice the parties should be held bound by the theory of action they so adopt. A theory of action accepted and acted upon in a trial court cannot be repudiated. Arkansas Anthracite C. & L. Co. v. Stokes, 8 Cir., 2 F.2d 511; Devine v. Zimmerman, 8 Cir., 133 F.2d 850; Smails v. O'Malley, 8 Cir., 127 F.2d 410; Petersen v. Chicago G. W. Ry. Co., 8 Cir., 138 F.2d 304. If plaintiff makes no claim to damages as a direct consequence of the factors set out in paragraphs XII and XIV of the amended complaint, then those matters are not actionable in this litigation to sustain a judgment for actual damages. They may be evidence available to plaintiff to prove the existence of the conspiracy relied on, but they are to be considered *injuria absque damno*, if plaintiff was not actually damaged thereby, or does not claim actual damages as a consequence thereof.

Mere existence of the nationwide conspiracy adjudicated in United States v. Paramount, supra, does not premise liability on defendants by estoppel in this case. The restraints upon "trade and commerce" there shown were abundantly unreasonable and clearly in violation of the "public interest" which must infest each Sherman Act case. Here, plaintiff's claim is not shown to be affected with any invasion of the public interest. It makes no substantial claim on that score. It had no legal right incident to its business to compel defendants to grant its demand. Under the facts available to plaintiff, we think it incapable of establishing any public interest or invasion of any legal right resident in it, that was violated by the assumed conspiracy.

Therefore, plaintiff has no claim for damages against defendants, even though a conspiracy existed as charged. Defendant's motion for summary judgment is sustained and plaintiff's complaint is hereby ordered dismissed.